## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAROLD LEAPHART,** | : | |
| | : | **Civil No. 3:11-CV-1333** |
| **Plaintiff,** | : | |
| | : | **(Judge Kosik)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **JOHN A. PALAKOVICH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.   Introduction

Harold Leaphart, a *pro se* prisoner committed to the custody of the
Pennsylvania Department of Corrections ("DOC") at SCI- Fayette, first brought this
civil rights action pursuant to 42 U.S.C. § 1983, on July 19, 2011. (Doc. 1)  In his
initial complaint, Leaphart named the following defendants:  John Palakovich, former
Superintendent at SCI-Smithfield; Jeffrey Beard, former Secretary of the Pennsylvania
DOC; David Wakefield, former Deputy Secretary; and John Wetzel, the current
Secretary of the Pennsylvania DOC (collectively the "Defendants").

As initially framed by Leaphart, the gravamen of the plaintiff's complaint
related to his placement on the DOC's Restricted Release List in November 2008, as
well as his continued placement in administrative custody at SCI-Fayette.  In the first

instance, Leaphart simply alleged that the RRL list placement violated his right to due process under the law. (Doc. 1)

On November 4, 2011, we filed a report and recommendation, which recommended that Leaphart's complaint be dismissed, since it was well-settled that an inmate's initial placement on the RRL list did not implicate due process concerns, and the procedures used to monitor Leaphart's continued placement on this list fully comported with due process. (Doc. 20)  Leaphart responded to this report and recommendation by filing an amended complaint. (Doc. 23)  That amended complaint re-stated Leaphart's due process claims, and added in a summary fashion a retaliation claim.  We have now reviewed this amended complaint as part of our statutorily mandated review process for *pro se* pleadings filed by litigants seeking leave to proceed *in forma pauperis*.  Having conducted this review, we conclude that the amended complaint, in its present form, remains flawed and should be dismissed.

## II.   <u>Statement of Facts and of the Case</u>

With respect to the allegations set forth in Leaphart's amended complaint, the pertinent procedural background and facts can be simply stated:

### A.   <u>Leaphart's Due Process Claims</u>

At the outset, with respect to Leaphart's due process claims, the well-pleaded facts reveal that during September 2007, Plaintiff was serving a sentence at

SCI-Smithfield when the Pennsylvania State Police charged him with assaulting a Correctional Officer. (Doc. 2, Ex. G) As a result of that assault, two SCI-Smithfield staff members were injured, requiring outside medical treatment. (Doc. 2) Subsequently, the case proceeded to trial and Leaphart was convicted of the assault and sentenced to 10 to 20 years in prison, consecutive to the sentence he was serving when he committed the assault. Id.

In addition to the criminal conviction, Leaphart was charged with an institutional misconduct for violating prison rules. (Doc. 2, Ex. 2) Subsequently, the Hearing Examiner convicted Leaphart of the misconduct and sentenced him to 90 days disciplinary time, effective September 3, 2007. Id. Leaphart served his disciplinary time in the Restricted Housing Unit ("RHU") at the prison. Upon expiration of Leaphart's disciplinary sentence, staff placed him on Administrative Custody ("AC") status, which required that he remain in the RHU. (Doc. 2)

Prior to his placement on AC status, Leaphart received a DC-141 "other" report and a hearing regarding his placement. Id. Additionally, at some point thereafter Defendant Beard approved a request by Superintendent Palakovich to place Leaphart on the Restricted Release List ("RRL"). In effect, this action transferred decision-making authority for Leaphart's release from AC status from the Program Review Committee to Secretary Beard or his designee.

3

Leaphart's placement on the Restricted Release List and his confinement in AC remain as issues at the heart of this amended civil rights complaint. (Doc. 23) Specifically, Leaphart continues to complain that he never received a due process hearing prior to being placed on the Restricted Release List, or an opportunity to appeal this placement, which he alleges violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. Leaphart also appears to challenge the duration of his status in Administrative Custody, claiming that this extended placement on the RRL violated his due process rights. (Id.)   Thus, Leaphart's renewed due process claims call upon us to consider the procedures established by the Department of Corrections governing RRL housing status in the prison system.

According to DOC policy DC-ADM 802, Administrative Custody is defined as "a status of confinement for non-disciplinary reasons that provides closer supervision, control, and protection than is provided in general population." DC-ADM 802, Section 3(A)(1).   An inmate confined on AC status does not have the privileges available in general population security level housing, and instead, receives a more limited set of privileges afforded within the Restricted Housing Unit.   Id. Under DOC regulations, an inmate may be transferred from general population to administrative custody by order of the shift commander for the following reasons:

a. the inmate is in danger by/from some person(s) in the facility and cannot be protected by alternate measures;

b. placement in general population would endanger the inmate's safety or welfare when it is not possible to protect him/her by other means;

c. the inmate is a danger to himself/herself or others;

d. the inmate is suspected of being or is the instigator of a disturbance;

e. the inmate would pose an escape risk in a less secure status;

f. the inmate has been charged with, or is under investigation for a violation of facility rules and there is a need for increased control pending disposition of charges or completion of the investigation;

g. the inmate has requested and been granted self-confinement;

h. the inmate is being held temporarily for another authority and is not classified for the general population of the holding facility; however, a Parole Violator (PV) and temporary transfers from another facility are eligible for release to general population;

i. the inmate has a detainer for a pending capital case, for which the prosecution is seeking the death penalty;

j. no records and/or essential information are available to determine the inmate's custody level or housing needs; and/or

k. the inmate has completed a Discipline Custody (DC) sanction but one or more of the above reasons exist, (or the facility has an operational need (e.g., appropriate bed space) to temporarily assign the inmate to AC status).

DC-ADM 802, Section 1(A)(1).

Moreover, a Facility Manager or his or her designee may request that the Secretary place an inmate on Administrative Custody status on the Restricted Release List when the inmate "poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern." Id. at Section 1(B).[1] Inmates on the Restricted Release List are a subset of the inmates who have been placed in the RHU on Administrative Custody status.  An RRL designation merely changes the final decision-maker with the authority to release the inmate from AC status into the prison's general population.  Id.  Specifically, when an

---

[1] Specifically, criteria for placing an inmate on the RRL include, but are not limited to, the following:

a. assaultive history against staff;

b. assaultive history against inmate(s);

c. sexual assault history;

d. escape history, or serious escape attempt;

e. threat to the orderly operation of a facility (i.e., attempting to organize inmates, demonstrated involvement in a Security Threat Group (STG) that poses a risk to the security of the facility, etc.);

f. Special Management Unit (SMU) graduate who remains a threat; and/or

g. SMU failure.

DC-ADM 802, Section 1(B)(2).

inmate is placed on the Restricted Release List, the designation takes the authority to release the inmate from AC status from the Program Review Committee ("PRC") and transfers it to the Secretary or his or her designee.  Id.

Furthermore, both RRL and non-RRL inmates have their custody status periodically reviewed by the PRC.  In the case of a non-RRL inmate, either the PRC or the Superintendent has the final authority to release the inmate into general population.  See DC-ADM 802, Section 4(A).  In the case of a RRL inmate, however, the PRC may recommend the inmate's release from AC status into general population, but the release requires the approval of the Secretary of Corrections or his or her designee.  See id.  In all other respects, RRL inmates are treated identically to their non-RRL counterparts on AC status.  See id.

Given this regulatory framework we initially concluded that the defendants' action of placing Leaphart on the RRL did not violate the plaintiff's due process rights since it did not impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  For that reason, we found that Leaphart had not pleaded facts alleging that he was deprived of a liberty interest as a result of his placement on the RRL.  See e.g.,  Bowen v. Ryan, 248 F. App'x 302, 304 (3d Cir. 2007) ("Appellant's claim that he was placed on the Restricted Release List without due process was properly dismissed.  Placement on this List did not deprive Bowen

of his liberty, privileges, or any other constitutionally protected liberty interest."); Nifas v. Beard, 2009 U.S. Dist. LEXIS 93235, 48-49 (W.D. Pa. Sept. 30, 2009) ("[P]lacement on the RRL could not amount to a deprivation of a liberty interest at all because, at most, it accomplishes only a change in the identity of the decision maker as to whether Plaintiff should be released from the AC or not.") *affirmed* and modified on other grounds at Nifas v. Beard, 374 Fed. Appx. 241 (3d Cir. 2010); Hill v. Fisher, 2010 U.S. Dist. LEXIS 141855 (M.D. Pa. Nov. 17, 2010) ("Placement on the Restricted Release List does not deprive an inmate of a liberty interest protected by the Due Process Clause").

We also found that, to the extent that Leaphart was complaining that he remained on the RRL for an excessive period without any due process review, the documents he attached to his complaint demonstrated beyond dispute that he had received all constitutionally mandated due process to which he was entitled. (Doc. 2) Relying upon the leading appellate case in this field,   Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000), we noted that in Shoats, after detailing the process provided by the Pennsylvania DOC to an inmate confined in administrative custody,[2] the Third

_____

[2] The Third Circuit explained the process provided by the Pennsylvania DOC to an inmate confined in administrative custody as follows:

A hearing is conducted by the PRC, in which the rationale for the administrative custody placement is read and explained to the inmate.

Circuit concluded that these procedures clearly complied with due process

---

The inmate is permitted to respond to the rationale for administrative custody placement either orally or in writing. A Committee member then drafts a summary of the inmate's statements. A written summary of the entire hearing is then prepared, which includes the reasons relied upon by the PRC to reach its decision, and a copy of this summary is given to the inmate.

An inmate may appeal the PRC's decision to the Superintendent in writing within two days of the completion of the hearing, and the decision of the Superintendent must be forwarded to the inmate within ten days of the receipt of the appeal. The inmate's right to appeal terminates when he or she is released from administrative custody.

At least once every thirty days, those inmates assigned to administrative custody have the right to be personally interviewed by the PRC. For those inmates not released from administrative custody following the thirty-day review, the reasons for the PRC's decision are forwarded to the Superintendent for his or her review. If the Superintendent agrees that the rationale for holding an inmate in administrative custody is reasonable, he or she notifies the inmate accordingly. If, however, the Superintendent believes the inmate should be released to the general population, he or she will so order it.

After an inmate is confined for ninety days in administrative custody, the Superintendent must complete a formal report to the Regional Deputy Commissioner, who then reviews the recommendation of the institution to determine if any further action is necessary. Further action may include release to the general population, transfer to another facility or program, or continuation in administrative custody. In light of the standard set forth by the Supreme Court in Hewitt, we conclude that the Pennsylvania procedures clearly comply with due process requirements.

<u>Shoats</u>, 213 F.3d at 145.

requirements.  <u>Shoats</u>, 213 F.3d at 145.  Essentially, the court held that a prisoner in long-term administrative segregation received due process, where at the outset of segregation the prisoner received notice of charges against him, followed by review with opportunity to be heard, the right to appeal to the prison's superintendent, and periodic review by the prison review committee.  <u>Id.</u>

From review of the documents that Leaphart attached to his complaint and placed in the record of this case, it was clear that Leaphart received process that comported with that found to be sufficient in <u>Shoats</u>.  In fact, Leaphart admitted in a grievance appeal attached to his complaint, that he received notice in the form of a DC-141 "other" report, and a hearing when he was placed on AC status.  (Doc. 2, p. 8)  Moreover, Leaphart provided, through exhibits attached to his complaint, numerous grievance appeals and prison staff responses, which amply demonstrated that: (1) he has been afforded the right to appeal the AC placement; and (2) clearly demonstrated Leaphart had unit team reviews on a weekly basis, and appeared before the PRC every 90 days.  (Doc. 2, p. 10)

Moreover, we found that any reading of Leaphart's complaint as challenging his continued confinement in AC or placement on the RRL as based solely on his past crimes failed since the record that Leaphart supplied the Court showed that Leaphart was not confined to the AC or placed on the RRL simply because he committed past

crimes, but rather because in the judgment of the prison professionals who have reviewed his status, he "poses a threat to the secure operation of the facility." DC-ADM 802, Section 1(B).  This assessment was based not only on Leaphart's "assaultive history against staff" but also on his more recent volatile conduct, including an April 5, 2011, review in which Superintendent Coleman noted, "[a]fter a thorough review of your records and your most recent misconduct for threatening staff 'the next time I get my hands on Fucking staff I will be going to death row' is a clear indication that you should remain on the RRL at this time."  (Doc. 2, at 19)

## B.   Leaphart's Retaliation Claim

In addition to the due process claims initially lodged by Leaphart relating to his placement and continuation on the RRL list, Leaphart's amended complaint also asserts in a summary fashion, that prison officials have "retaliated" against him by now transferring him to the Special Management Unit.  As described by Leaphart, this retaliation claim is based solely upon circumstantial evidence, what Leaphart characterizes as a suspicious coincidental timing between the filing of his lawsuit, and this transfer.  However, with respect to this circumstantially shown retaliation claim based upon Leaphart's SMU transfer, the documents tendered by Leaphart actually thoroughly contradict this claim.

For example, these documents reflect that prison officials had been discussing a Special Management Unit transfer with Leaphart since at least August of 2009, two years before Leaphart filed this lawsuit. (Doc. 1, p. 7)  Prison officials then continued to urge Leaphart to take advantage of this program over the past two years. (Id., p.10.) Consistent with this longstanding dialogue between Leaphart and prison officials, in late August 2011, Leaphart was approved for a transfer to the Special Management Unit, a step which would allow him to be removed from the RRL if he successfully completed this program. (Doc. 24)  Moreover, given the prospect that this placement can result in Leaphart's ultimate removal from the RRL, something Leaphart desired, the Plaintiff's response to this decision has been, at most, ambivalent.  Thus, even as he protests this decision in his amended complaint, he attaches to that complaint records which indicate that he favors this placement and is asking correctional staff: " I would like to know has *my* petition for the (SMU) programs been (approved). . . .? (Doc. 23, p. 28)(emphasis added.)

Thus, in its current form, Leaphart's amended complaint couples a due process claim which we have already found to be wanting with a circumstantial retaliation claim, where the documents attached to Leaphart's pleadings actually rebut his assertion that his SMU placement is some recent form of retaliation for the filing of this lawsuit in July of 2011, since those documents show that this placement is a

longstanding policy option that has been repeatedly presented to Leaphart over the past two years.

On these facts, it is recommended that Leaphart's amended complaint be dismissed.

### III.   Discussion

#### A.   Screening of *Pro Se* Prisoner Complaints–Standard of Review

This Court has a statutory obligation to conduct a preliminary review of *pro se* complaints which seek redress against government officials.  Specifically, we are obliged to review the complaint pursuant to 28 U.S.C. § 1915A which provides, in pertinent part:

> **(a) Screening**. - The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a  prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.

> **(b) Grounds for dismissal**. - On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint-

> (1) is frivolous, malicious, or fails to state a claim upon which relief may be  granted; or

> (2) seeks monetary relief from a defendant who is immune from such relief.

Under Section 1915A, the Court must assess whether a *pro se* complaint "fails to state a claim upon which relief may be granted." This statutory text mirrors the language of Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly,</u> 550 U.S. 544 (12007) continuing with our opinion in <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u> –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. <u>Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.</u>, 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald

assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983).  As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss.  In Ashcroft v. Iqbal, __U.S. __, 129 S.Ct. 1937 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950.  According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949.  Rather, in

conducting a review of the adequacy of complaint, the Supreme Court has advised

trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than
> conclusions are not entitled to the assumption of truth. While legal
> conclusions can provide the framework of a complaint, they must be
> supported by factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement to relief.

Id. at 1950.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than

mere legal labels and conclusions. Rather, a complaint must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere

speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state
> a claim, district courts should conduct a two-part analysis. First, the
> factual and legal elements of a claim should be separated. The District
> Court must accept all of the complaint's well-pleaded facts as true, but
> may disregard any legal conclusions. Second, a District Court must then
> determine whether the facts alleged in the complaint are sufficient to
> show that the plaintiff has a 'plausible claim for relief.' In other words,
> a complaint must do more than allege the plaintiff's entitlement to relief.
> A complaint has to 'show' such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

In addition to these pleading rules, a civil complaint must comply with the

requirements of Rule 8(a) of the Federal Rule of Civil Procedure which defines what

a complaint should say and provides that:

16

> (a) A pleading that states a claim for relief must contain (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fowler, 578 F.3d at 210-11.

These heightened pleading standards apply to all aspects of the Court's threshold analysis of a complaint's legal sufficiency. Thus, we will apply this analysis both when assessing the adequacy of the factual assertions set forth in the complaint, and when examining whether the complaint states one or more valid causes of action against the named defendants.

We observe further that when "deciding a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); see also Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007).  Additionally, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir.

2002) ("Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (internal quotation omitted).  However, the court may not rely on other parts of the record in making its decision.  <u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1250, 1261 (3d Cir. 1994).

  B. <u>Leaphart's Due Process Claim Continues to Fail As a Matter of Law</u>

  At the outset, we find that the due process claims set forth in the amended complaint relating to Leaphart's RRL placement still fail to state a claim upon which relief can be granted.  In this regard, Leaphart simply appears to re-state a twofold claim that was previously rejected by this court arguing: (1) that his designation as a RRL prisoner is an event separate from placement in administrative custody, and he argues that he is entitled to due process protections as part of this placement; and (2) contending that the duration of his placement in administrative custody, and the attendant hardships of such confinement, create in him a protected liberty interest in being released to the general prison population.

  However, as we have previously observed, in analyzing a procedural due process claim, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth

18

Amendment." <u>Shoats v. Horn</u>, 213 F.3d 140, 143 (3d Cir. 2000) (citing <u>Fuentes v.</u>

<u>Shevin</u>, 407 U.S. 67 (1972)).  Once we determine that a property or liberty interest

asserted is protected by the Due Process Clause, the question then becomes what

process is due to protect it. <u>Id.</u> (citing <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)).

   Protected liberty or property interests generally arise either from the Due Process

Clause or from state-created statutory entitlement. <u>See</u> <u>Board of Regents v. Roth</u>, 408

U.S. 564, 575 (1972).  However, in the case of prison inmates,

> [i]n <u>Sandin v. Conner</u>, the Supreme Court announced a new standard for
> determining whether prison conditions deprive a prisoner of a liberty
> interest that is protected by procedural due process guarantees.  Although
> the Court acknowledged that liberty interests could arise from means
> other than the Due Process Clause itself, the Court concluded that
> state-created liberty interests could arise only when a prison's action
> imposed an '*atypical and significant hardship on the inmate in relation
> to the ordinary incidents of prison life*.' . . . In finding that the prisoner's
> thirty-day confinement in disciplinary custody did not present the type
> of atypical, significant deprivation in which a State might conceivably
> create a liberty interest, the Court considered the following two factors:
> 1) the amount of time the prisoner was placed into disciplinary
> segregation; and 2) whether the conditions of his confinement in
> disciplinary segregation were significantly more restrictive than those
> imposed upon other inmates in solitary confinement.

<u>Shoats</u>, 213 F.3d at 143-44(citations omitted, emphasis added).

   In accordance with these constitutional benchmarks we continue to conclude

that Leaphart has alleged no facts that tend to show how his initial placement on the

RRL has subjected him to "atypical and significant hardship."  In fact, the RRL is

comprised of inmates who are restricted from being released from AC status without the prior approval of the Secretary or his or her designee.   See DC-ADM 802.   This means that, unlike most other inmates in administrative custody, an inmate on the RRL may not be released from administrative custody by order of the Program Review Committee.   DC-ADM 802, Section 4.   Instead, the Program Review Committee may only recommend release, with the ultimate decision to be made by the Secretary or his or her designee. Id.   Thus, placement on the RRL simply causes a change in the identity of the decision-maker as to whether Leaphart should be released.

Therefore, we continue to find that Leaphart's placement on the RRL did not alter the amount of time he was placed into disciplinary segregation; nor did it render the conditions of his confinement significantly more restrictive, and did not impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.   For these reasons, we still conclude that Leaphart has not pleaded facts alleging that he was deprived of a liberty interest as a result of his placement on the RRL, a finding that remains consistent with other decisions of the Third Circuit and district courts within the Third Circuit.   See Bowen v. Ryan, 248 F. App'x 302, 304 (3d Cir. 2007) ("Appellant's claim that he was placed on the Restricted Release List without due process was properly dismissed.  Placement on this List did not deprive

Bowen of his liberty, privileges, or any other constitutionally protected liberty interest."); <u>Nifas v. Beard</u>, 2009 U.S. Dist. LEXIS 93235, 48-49 (W.D. Pa. Sept. 30, 2009) ("[P]lacement on the RRL could not amount to a deprivation of a liberty interest at all because, at most, it accomplishes only a change in the identity of the decision maker as to whether Plaintiff should be released from the AC or not.") *affirmed* and modified on other grounds at <u>Nifas v. Beard</u>, 374 Fed. Appx. 241 (3d Cir. 2010); <u>Hill v. Fisher</u>, 2010 U.S. Dist. LEXIS 141855 (M.D. Pa. Nov. 17, 2010) ("Placement on the Restricted Release List does not deprive an inmate of a liberty interest protected by the Due Process Clause").  Thus, regarding Leaphart's placement on the RRL, we conclude that the amended complaint still fails to state a due process claim upon which relief may be granted.

Similarly, to the extent Leaphart is challenging the duration of his placement on due process ground we find Leaphart still has failed to allege any facts to articulate or support such a claim.  In <u>Shoats</u>, the Third Circuit concluded that "eight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life, and that Shoats' eight-year confinement subjects him to conditions that differ significantly from 'routine' prison conditions in Pennsylvania state institutions." <u>Shoats</u>, 213 F.3d at 144.

In reaching that decision, the court relied on the record to find atypical and significant hardships had been placed upon the inmate:

> Shoats has been confined in virtual isolation for almost eight years.  He is confined in his cell for 23 hours a day, five days a week, and 24 hours a day, two days a week.  He eats meals by himself.  His sole contact is with DOC officials, and has been denied contact with his family for almost eight years.  He is prohibited from participating in any educational, vocational, or other organizational activities.  He is prohibited from visiting the library.

Id.

In stark contrast, Leaphart has not alleged any facts to support his claim that he faces atypical and significant hardship as a result of his four and a half year placement in administrative custody.  However, even if Leaphart had made sufficient factual allegations, the documents he has attached to his complaint and amended complaint demonstrate beyond dispute that he has received all constitutionally mandated due process to which he is entitled.  In Shoats, after detailing the process provided by the Pennsylvania DOC to an inmate confined in administrative custody, the Third Circuit concluded that the procedures clearly complied with due process requirements.  Shoats, 213 F.3d at 145.  Essentially, the court held that a prisoner in long-term administrative segregation received due process, where at the outset of segregation the prisoner received notice of charges against him, followed by review with opportunity

to be heard, the right to appeal to the prison's superintendent, and periodic review by the prison review committee review.  Id.

From review of the documents that Leaphart attached to his complaint and amended complaint, and placed in the record of this case, it is clear that Leaphart has received process that comported with that found to be sufficient in Shoats.  In fact, Leaphart admits in a grievance appeal attached to his complaint, that he received notice in the form of a DC-141 "other" report, and a hearing when he was placed on AC status.  (Doc. 2, p. 8)  Moreover, Leaphart provides, through exhibits attached to his complaint, numerous grievance appeals and prison staff responses, which show that he has been afforded and taken advantage of the right to appeal the AC placement. In addition, Leaphart's exhibits make clear that his status was reviewed periodically. Specifically, Leaphart has had, and continues to have, unit team reviews on a weekly basis, and appears before the PRC every 90 days.  (Doc. 2, p. 10)  Thus, assuming *arguendo* that he has a liberty interest in his AC placement, Leaphart has received all the process to which he is constitutionally entitled.

Moreover, any reading of Leaphart's amended complaint as challenging his continued confinement in AC or placement on the RRL as based solely on his past crimes also fails.  Quite the contrary, the record that Leaphart has supplied the Court shows that Leaphart was not confined to the AC or placed on the RRL simply because

23

he committed past crimes, but rather because in the judgment of the prison professionals who have reviewed his status, he "poses a threat to the secure operation of the facility." DC-ADM 802, Section 1(B).  This assessment is based not only on Leaphart's "assaultive history against staff" but also on his more recent volatile conduct.  In this regard, we note that in a response letter to Leaphart dated April 5, 2011, Superintendent Coleman notes, "[a]fter a thorough review of your records and your most recent misconduct for threatening staff 'the next time I get my hands on Fucking staff I will be going to death row' is a clear indication that you should remain on the RRL at this time."   (Doc. 2, at 19)  Far from supporting Leaphart's wholly speculative suggestion that his placement on AC status and on the RRL was for punitive purposes, this documentary evidence lends support to the findings of prison officials that Leaphart had proven himself a suitable candidate for the RRL and continued administrative custody, and that prison officials had a sound basis for finding that Leaphart had not yet shown himself to be appropriately suited to placement in general population.

### B.      Leaphart's Retaliation Claim Fails on these Pleadings

Leaphart has also advanced a retaliation claim in his amended complaint based upon his transfer to the Special Management Unit, during the pendency of this litigation.  With respect to this claim concerning his housing transfer, at the outset, it

is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. <u>Moody v. Daggett</u>, 429 U.S. 78, 88 (1976); <u>Montanye v. Haymes</u>, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." <u>Id.</u> Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. <u>See, e.g.</u>, <u>Hassain v. Johnson</u>, 790 F.2d 1420 (9th Cir. 1986); <u>Serrano v. Torres</u>, 764 F.2d 47 (1st Cir. 1985). Accordingly, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. <u>See, e.g.</u>, <u>Gov't of Virgin Island v. Gereau</u>, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); <u>Rodriguez-Sandoval v. United States</u>, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment. <u>See</u> <u>Olim v. Wakinekona</u>, 461 U.S. 238, 245 (1983); <u>Meachum v. Fano</u>, 427 U.S. 215 225 (1976); <u>Montanye</u>, 427 U.S. at 242; <u>Bulger v. U.S. Bureau of Prisons</u>, 65 F.3d 48 (5th Cir. 1995); <u>Marchesani v. McCune</u>, 531 F.2d 459 (10th

Cir.1976).  Therefore, it is clear that an inmate like Leaphart, has no constitutional right to a particular special housing status.  See, e.g., DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir.  2010)(denying inmate Z-Code cell transfer retaliation claim); Emile v. SCI-Pittsburgh, No. 04-974, 2006 WL 2773261, *6 (W.D.Pa. Sept. 24, 2006) (denying inmate preliminary injunction in the form of Z-code cell status); Brown v. Sobina, No. 08-128E, 2008 WL 4500482 (W.D.Pa. Oct. 7, 2008)(denying inmate preliminary injunction); Messner v. Bunner, No. 07-112E, 2009 WL 1406986 (W.D.Pa. May 19, 2009)(denying inmate preliminary injunction in the form of Z-code cell status).  Therefore, to the extent that Leaphart attempts to premise this claim on some constitutional right to a particular housing arrangement, the claim plainly fails to state a cause of action upon which relief can be granted.

Recognizing the fact that he is not entitled to a particular transfer or housing status, Leaphart has cloaked his constitutional claims as a cause of action against prison officials based upon allegedly retaliatory transfers within the prison. Leaphart's retaliation claim rests on circumstantial evidence, with Leaphart asserting that the timing and chronology of these events are circumstantial proof of this retaliation.

Leaphart faces a demanding burden of proof in attempting to allege such a retaliation claim based upon circumstantial proof.  Inmates like Leaphart frequently

invite courts to infer retaliatory motives to cell assignments and other prison policies. Yet, these invitations, while frequently made, are rarely embraced by the courts. Compare DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Alexander v. Fitch, No. 07-1732, 2010 WL 1257709 (W.D. Pa. March 26, 2010)(same); Carpenter v. Kloptoski, No. 08-2233, 2010 WL 891825 (M.D. Pa. March 10, 2010)(same); Solan v. Ranck, No. 06-49, 2007 WL 141918 (M.D.Pa. Jan. 18, 2007)(denying retaliation claim, in part); with Curtician v. Kessler, No. 07-286, 2009 WL 2448106 (W.D. Pa. Aug. 7, 2009)(factual issues preclude dismissal of inmate cell transfer retaliation claim).

Rather, a prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove the following three elements: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

Examples of adverse actions that have, in certain cases, been found to support a retaliation claim include filing false misconduct reports, <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, <u>Rauser v. Horn</u>, 241 F.3d 330, 333-34 (3d Cir. 2001), and placing a prisoner in administrative custody, <u>Allah</u>, 229 F.3d at 225.

The third essential element to a retaliation claim is that there be a causal link between the exercise of a constitutional right and the adverse action taken against the prisoner. <u>Rauser</u>, 241 F.3d at 333-34.  To establish this third, and crucial, component to a constitutional retaliation claim, causation, Leaphart must make an exacting showing.  In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. <u>See</u> <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir.1997); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir.1997).  In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir.2000).

<u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007). Moreover, when examining these causation issues, we are specifically admonished that:

A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

<u>Id.</u> at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. <u>Ambrose v. Twp. of Robinson</u>,

303 F.3d 488, 493 (3d Cir.2002); Meenan v. Harrison, Civ. A. No. 3:03-
CV-1300, 2006 WL 1000032, at *4 (M.D.Pa. Apr.13, 2006) (observing
that a plaintiff must demonstrate that the exercise of First Amendment
rights "played some substantial role" in the defendant's action). The
temporal proximity of a retaliatory act to a plaintiff's exercise of his or
her First Amendment rights is probative, but not dispositive, of the
causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d
Cir.2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173,
178 (3d Cir.1997) (stating that "temporal proximity merely provides an
evidentiary basis from which an inference can be drawn"). For temporal
proximity alone to establish causation, the "timing of the alleged
retaliatory action must be 'unusually suggestive' of retaliatory motive
before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting
Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)) . . .
[T]he Third Circuit Court of Appeals has suggested that a temporal
proximity of two days is sufficient to establish causation, see Farrell v.
Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5 (3d Cir.2000), whereas
a temporal proximity of ten days is sufficient to establish causation only
when accompanied by other evidence of . . . wrongdoing, Shellenberger
v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir.2003). This suggests
that the temporal proximity must be measured in days, rather than in
weeks or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., No. 06-2245,  2009 WL 1227950, *3 (M.D.Pa. April 30,

2009).

Applying this standard, courts in civil rights cases have frequently rebuffed

speculative efforts to infer causation from temporal proximity when a span of weeks,

months or years separated the plaintiff's constitutionally protected conduct from the

defendants' alleged acts of retaliation.  Thus, "[o]ur sister courts have held that a

temporal proximity of as little as seventeen days was insufficient to establish

causation. See Killen v. N.W. Human Servs., Inc., No. 06-4100, 2007 WL 2684541,

at *8 (E.D.Pa. Sept.7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04-2231, 2007 WL 3231969, at *11 (M.D.Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05-19, 2007 WL 2769718, at *4 (W.D.Pa. Sept.20, 2007) (holding that temporal proximity of three months was insufficient to establish causation)." Fischer v. Transue, 04-2756, 2008 WL 3981521, *10 (M.D.Pa. Aug. 22, 2008)(holding that temporal proximity of three weeks was insufficient to establish causation).

In practice, application of these legal tenets has often led to the rejection of retaliation claims as legally insufficient when those claims are like the retaliation assertion made here:  An assertion of retaliation based solely on circumstantial proof of some temporal link between the plaintiff's conduct and the defendants' actions when the evidence shows that these events are separated by a significant temporal gulf. See, e.g., DeFranco  v. Wolfe, 387 F. App'x 147 (3d Cir.  2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Bailey v. Commercial National Insurance Co., 267 F. App'x, 167 (3d Cir. 2008)(employment discrimination-retaliation case, four months temporal proximity insufficient);

Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient);  Conklin v. Warrington Tp., No. 06-2245,  2009 WL 1227950 (M.D.Pa. April 30, 2009)(two months temporal proximity insufficient); Rogers v. Delaware, Dept. of Public Safety/DMV 541 F.Supp.2d 623, 627 (D.Del. 2008) (10 months insufficient); Brown v. Boeing, 468 F.Supp.2d 729 (E.D.Pa. 2007)(3-4 months insufficient); Lumban-Tobing v. Potter, No. 04-979, 2005 WL 2100691 (M.D. Pa. Aug. 30, 2005)(9 months insufficient temporal proximity, but other proof creates factual issue precluding summary judgment).

Finally, if a plaintiff discharges his obligation to satisfy this three-part *prima facie* test, the burden then shifts to the defendant to prove by a preponderance of the evidence that he or she would have made the same decision absent the protected conduct for reasons reasonably related to penological interest.  Carter, 292 F.3d at 158.  "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334.

Here, the well-pleaded facts recited by Leaphart simply do not permit a reasonable inference of retaliation against him by prison officials. Quite the contrary, those facts show that prison officials have been discussing with Leaphart the benefits of an SMU transfer since the summer of 2009, two years before the filing of this lawsuit. While the transfer decision was made in late August 2011, some five weeks after Leaphart filed his complaint, that fact–standing alone–is legally insufficient to permit an inference of retaliation, particularly when it appears that this action had been pending for many months prior to the filing of Leaphart's complaint in this case. Furthermore, it is unclear that Leaphart regarded this action as adverse, another prerequisite to a retaliation claim, since Leaphart has on at least one occasion asked correctional staff:  "I would like to know has *my* petition for the (SMU) programs been (approved). . . .? (Doc. 23, p. 28)(emphasis added.)  In sum, given the lack of any unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory conduct of prison officials, Leaphart's retaliation claim, in its present form, fails as a matter of law and should be dismissed.

### D.    The Defendants Are Entitled to Qualified Immunity

Finally, even if Leaphart had stated a colorable claim for any actions relating to these transfer decisions, the defendants are nevertheless entitled to qualified immunity from these claims for damages.  In order to establish a civil rights claim

Leaphart must show the deprivation of a right secured by the United States Constitution or the laws of the United States.  Satisfying these elements alone, however, does not guarantee that Leaphart is entitled to recover damages from these public officials.  Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct. 808, 815 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit."  Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 129 S. Ct. at 815.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.  First, the court must evaluate whether the defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194,

34

201-02 (2001), abrogated in part by <u>Pearson</u>, 129 S. Ct. 808; <u>Curley v. Klem</u>, 499 F.3d 199, 206 (3d Cir. 2007); <u>Williams v. Bitner</u>, 455 F.3d 186, 190 (3d Cir. 2006).  If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.  <u>Saucier</u>, 533 U.S. at 201.  If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted.  <u>Pearson</u>, 129 S. Ct. at 815-16; <u>Saucier</u>, 533 U.S. at 201-02.  The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  <u>Williams</u>, 455 F.3d at 191 (citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law

even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).")  Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

36

In this case, where discussions of Leaphart's SMU transfer began two years prior to Leaphart's constitutionally protected litigation activity, reasonable corrections officials could not have recognized that these remote and disparate events would support a retaliation claim. Indeed, far less remote and more proximate events have been held legally insufficient to support such a claim of retaliation. Given the state of the law in this field, in this setting the defendants simply could not have recognized that their actions on Leaphart's transfer would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Laid, 526 U.S. 603, 609 (1999). Therefore the defendants are entitled to qualified immunity on this claim.[3]

We recognize that *pro se* plaintiffs should be afforded an opportunity to amend a complaint before the complaint is dismissed with prejudice, see Fletcher-Hardee Corp. v. Pote  Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless it is clear that granting further leave to amend would be futile, or result in undue delay. Alston v. Parker, 363 F.3d  229, 235 (3d Cir. 2004). In this case, Leaphart has been provided an opportunity to amend his due process claim, but to no avail. Therefore, it is recommended that this due process claim be dismissed with prejudice.

---

[3]This Court is entitled to address this qualified immunity defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge).

As for Leaphart's retaliation claim, while the current well-pleaded facts do not alleged facts that would state a claim upon which relief may be granted , nonetheless out of an abundance of caution, and in order to preserve the plaintiff's rights, it is recommended that this matter be dismissed without prejudice to providing Leaphart one final attempt to amend this federal complaint  to state a claim upon which relief may be granted in federal court, by including proper allegations that meet the requirements of federal law.

## IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED, as follows:

1.    The due process claim set forth in Leaphart's amended complaint should be dismissed with prejudice.

2.    The retaliation claims set forth in Leaphart's amended complaint should be dismissed without prejudice to any final effort by the plaintiff to timely allege facts in an amended complaint which might state a claim upon which relief may be granted

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties,

written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 12th day of December 2011.

_**S/Martin C. Carlson**_
Martin C. Carlson
United States Magistrate Judge